IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY | : : : | CIVIL ACTION |
| v. | : : | |
| G.W.S.I., INC. | : | NO. 16-2094 |

## MEMORANDUM OPINION

Savage, J.                                                                                     August 22, 2017

A railroad's assessment of demurrage charges affects the relationships among the railroad, the shipper, the receiver, and the consignee. The shipper decides what mode of transportation to use, what carrier to use, and what quantity to ship. The railroad determines when demurrage starts to accrue. In other words, it sets the time limit the receiver has to unload cars. The receiver, who is hired by the shipper, has no control of those decisions. Yet, it is the receiver who is responsible for any delay in unloading the goods within the railroad's deadline.

This arrangement demands cooperation between the shipper, the carrier, and the receiver. Of the three participants in the delivery system, the receiver has little, if any, leverage. Consequently, the receiver often operates under terms fixed by others.

It is against this backdrop that Norfolk Southern Railway Company's claim against G.W.S.I., Inc for demurrage arises. The pertinent facts are set forth in the Findings of Fact. This memorandum opinion explicates the conclusions of law in support of the judgment.

## Analysis

Interstate rail carriers "shall compute demurrage charges, and establish rules

related to those charges." 49 U.S.C. § 10746. Any person receiving "rail cars from a rail carrier for . . . unloading who details the cars beyond the period of free time set forth in the governing demurrage tariff may be held liable for demurrage," as long as the carrier has provided the receiver with actual notice of its tariff before placing the railcars. 49 C.F.R. § 1333.3.

A rail carrier and a receiver may enter into a private contract governing demurrage. *Id.* § 1333.2. In the absence of an agreement, demurrage is governed by the rail carrier's tariff. *Id.*

The parties agree that Norfolk Southern's Tariff NS 6004-D governs their relationship. Norfolk Southern provided notice of the tariff on June 15, 2014, prior to the period during which the demurrage charges at issue accrued.[1] There was no written demurrage agreement.

GWSI contends that it is not liable for the charges despite the absence of an agreement varying the tariff. It asserts defenses of waiver and estoppel. It argues that Norfolk Southern impliedly waived its right to recover demurrage as a result of its conduct and representations. It also contends that Norfolk Southern is estopped from collecting demurrage because it continued to accept railcars in reliance upon Norfolk Southern's conduct and statements which led it to believe that demurrage would not be charged.

Waiver and estoppel are often used interchangeably, sometimes incorrectly. *Brown v. City of Pittsburgh*, 186 A.2d 399, 401 n.3 (Pa. 1962). Waiver turns on the conduct and the intent of the party against whom waiver is asserted. The waiving

---

[1] Ex. P-4.

party's intent is controlling. *Id.* Estoppel focuses on the conduct of both parties. *Id.*

In this case, the distinction makes a difference. Norfolk Southern never intended to waive demurrage, but it acted like it did. Hence, the inquiry is on what Norfolk Southern and GWSI did.

*Waiver*

Waiver is the intentional relinquishment or abandonment of a known right, claim, or privilege. *Id.* at 401. Central to waiver is the waiving party's intent and conduct. Waiver requires that the other party knowingly gave up the right and acted clearly, unequivocally, and decisively to relinquish it. *Commonwealth ex rel. Corbett v. Griffin*, 946 A.2d 668, 679 (Pa. 2008) (quoting *Brown*, 186 A.2d at 401); *see also Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F. Supp. 2d 416, 424 (E.D. Pa. 2011) (quoting *Griffin*, 946 A.2d at 678).

Waiver may be express or implied. *Brown*, 186 A.2d at 401. An implied waiver arises when undisputed acts or language mislead the other party into reasonably believing that the waiving party will not seek to enforce compliance with the contract provision. *Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs., L.P.*, 610 A.2d 499, 501 (Pa. Super. 1992); *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1223 (Pa. Super. 1989).

Here, there was no express waiver of demurrage accruing after February 2015. On July 1, 2015, Norfolk Southern clearly and unequivocally waived demurrage charges that had accrued from January 2012 through February 2015.[2] The question is whether the waiver extended beyond that period. In other words, was the waiver intended to

---

[2] Ex. P-19. The parties agree that demurrage had been waived during this period.

apply as long as Norfolk Southern delivered railcars to GWSI?

Tariff NS 6004-D incorporates Norfolk Southern's Conditions of Carriage. NS Conditions of Carriage #1-E Rule 250 provides, "Acceptance of shipment by consignee or beneficial owner shall be deemed acceptance of responsibility for payment of all charges accruing on the shipment, including, but not limited to, demurrage . . . ."[3] It also provides that a waiver of the conditions shall not constitute a precedent and shall not bind Norfolk Southern unless made in writing and signed by an authorized officer.[4] There is no writing waiving demurrage charges. Accordingly, by operation of the non-waiver provision, the forgiveness of the demurrage charges for the limited period did not bind Norfolk Southern for future charges.

Absent express waiver, the waiving party's intent is controlling, unless its conduct misleads the other party, to its prejudice, into honestly believing that a waiver was consented to or intended. *Brown*, 186 A.2d at 401 & n.3; *see also Commonwealth ex rel. Corbett v. Large*, 715 A.2d 1226, 1229 (Pa. Commw. 1998) (citing *Brown*, 186 A.2d at 401). Waiver will not be implied unless the waiving party has induced the other party to conclude that it intended to waive the right or claim. *See Prime Medica Assocs. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1158 (Pa. Super. 2009). There must be clear evidence that the waiving party intended to waive the right or claim regardless of the other party's understanding and conduct. *Brown*, 186 A.2d at 401 n.3. At the heart of waiver is the waiving party's intent. No particular effect on the other party is necessary, as long as it believes the waiving party intended to waive. *See Prime Medica*, 970 A.2d

---

[3] Ex. P-3 at NS_4360.

[4] Ex. P-3 at NS_4371.

at 1158.

Norfolk Southern gave some thought to waiving demurrage as part of a business development plan with GWSI, but never concluded a deal. It did not intentionally relinquish its right to demurrage. Even though GWSI may have deduced from Norfolk Southern's conduct that it was waiving the charges, Norfolk Southern did not intend to waive demurrage. On the contrary, Norfolk Southern intended to waive only if GWSI was instrumental in securing new business for Norfolk Southern. It was keeping its options open.

GWSI has not shown that Norfolk Southern clearly, unequivocally, and decisively intended to waive demurrage. On the contrary, Norfolk Southern repeatedly billed and demanded payment for demurrage. Even as Norfolk Southern considered waiving prior demurrage through February 2015, it continued to send GWSI invoices for demurrage charges that accrued after that date. It repeatedly asked GWSI "to advise on when payment is to be expected or if you have any disputes."[5] In September 2015, Vincent Cape threatened a lawsuit unless GWSI paid outstanding demurrage bills within two weeks.[6] That Norfolk Southern continued to ship railcars to GWSI even though GWSI did not pay demurrage does not mean Norfolk Southern intended to waive demurrage. Norfolk Southern continued to demand payment. These actions demonstrate that Norfolk Southern did not clearly and unequivocally intend to waive demurrage. Indeed, it is clear that it never intended to do so unless certain conditions were met. Thus, focusing on Norfolk Southern's intent, we find that Norfolk Southern did not waive

---

[5] *E.g.*, Ex. D-12 (e-mails sent March 11, 2015; March 19, 2015; and April 29, 2015).

[6] Ex D-7 at NS_4413.

5

demurrage.

## *Estoppel*

Estoppel precludes a party from acting differently than the manner in which it induced the other party to reasonably expect. *Novelty Knitting Mills v. Siskind*, 457 A.2d 502, 503 (Pa. 1983); *Homart Dev. Co. v. Sgrenci*, 662 A.2d 1092, 1099 (Pa. Super. 1995). Estoppel is an equitable doctrine of fundamental fairness. Whether it applies depends on the particular facts of the case.

Estoppel requires a party, by its conduct, to induce another to believe certain facts upon which the other relies and acts upon to its prejudice. *Fessenden Hall of Pa., Inc. v. Mountainview Specialties, Inc.*, 863 A.2d 578, 579 (Pa. Super. 2004). Unlike waiver, which focuses on the waiving party's intent and conduct, estoppel turns on the conduct of both parties. *Brown*, 186 A.2d at 401 n.3.

The party asserting it bears the burden of establishing equitable estoppel "by clear, precise, and unequivocal evidence." *Charter Oak Ins. Co. v. Maglio Fresh Food*, 979 F. Supp. 2d 581, 597 (E.D. Pa. 2013) (quoting *Chrysler Credit Corp. v. First Nat'l Bank & Trust Co.*, 746 F.2d 200, 206 (3d Cir. 1984)); *Prime Medica*, 970 A.2d at 1157.

The two essential elements of equitable estoppel are inducement and reliance. *Zitelli v. Dermatology Educ. & Research Found.*, 633 A.2d 134, 139 (Pa. 1993) (citing *Novelty Knitting*, 457 A.2d at 503); *Smires v. O'Shell*, 126 A.3d 383, 393 (Pa. Commw. 2015) (citing *Novelty Knitting*, 457 A.2d at 503). To establish inducement, the party asserting estoppel must show that the other party intentionally or negligently misrepresented a material fact, knowing or with reason to know that the other party would justifiably rely on the misrepresentation. *Homart*, 662 A.2d at 1099–1100. The

6

inducement may be words or conduct. Even if the other party did not intend to mislead the other party, it may be estopped if it acted with gross or culpable negligence, not mere negligence. *Hertz Corp. v. Hardy*, 178 A.2d 833, 837 (Pa. Super. 1962) (citing *Nw. Nat'l Bank*, 27 A.2d 20); *see also Zitelli*, 633 A.2d at 139 (quoting *In re Estate of Tallarico*, 228 A.2d 736, 741 (Pa. 1967)).

To establish reliance, the party asserting estoppel must prove that it acted to its detriment by justifiably relying on the misrepresentation. *Homart*, 662 A.2d at 1099–1100. It must show that the misrepresentation (words or conduct) induced it to act or refrain from acting to its detriment. *Zitelli*, 633 A.2d at 139 (quoting *Novelty Knitting*, 457 A.2d at 503–04). It cannot claim justifiable reliance if it had a duty to inquire but failed do so. *Id.* at 139–40 (quoting *Tallarico*, 228 A.2d at 741); *One Reading Ctr.*, 143 F. Supp. 2d at 521 (quoting *Homart*, 662 A.2d at 1099–1100).

In determining whether estoppel applies, we look at what each party did and said, what the other party did in response to the conduct, and whether the other party was justified in relying on what the inducing party said or did.

Norfolk Southern, by its conduct, intentionally misled GWSI to induce it to continue receiving railcars. Norfolk Southern did not want to lose the Chiquita business and it wanted to get new business coming through Wilmington. To accomplish these goals, Norfolk Southern led GWSI to believe it was not liable for demurrage. GWSI repeatedly informed Norfolk Southern employees that it did not agree to demurrage charges. It advised Norfolk Southern to stop sending railcars if it intended to collect demurrage. Nevertheless, Norfolk Southern continued delivering railcars and worked with GWSI to alleviate unloading delays.

In May 2014, Norfolk Southern demanded that GWSI pay a security deposit against demurrage charges. Tom Kenny, GWSI's president, requested that the demurrage issue be placed on hold until they investigated the causes of the delays. The following month, Norfolk Southern representatives met with Kenny to discuss the demurrage issue. They recommended leasing an additional siding from Conrail to speed up the unloading process. Six months later, in December 2014, GWSI was given access to the siding.

Instead of halting shipments after GWSI did not make the security deposit, Norfolk Southern continued to deliver cars to Stony Creek for movement to GWSI. It did so despite Kenny's clear instruction to stop delivering cars as long as Norfolk Southern charged demurrage.

On July 1, 2014, Doug McNeil, Norfolk Southern's director of marketing, sent an email, stating, "If at any time you feel shipments enroute will exceed your capacity, let us know and we will be happy to temporarily embargo all shipments on NS to prevent shippers from overwhelming your capacity."[7]

Norfolk Southern knew that its competitor, CSX, shipped railcars to the Stoney Creek Yard. It also knew that CSX did not charge GWSI demurrage. GWSI had the ability to persuade Chiquita and its other customers to use CSX instead of Norfolk Southern. Norfolk Southern did not want to lose the Chiquita business, its second-highest revenue generator in the Paper, Clay, and Forest product group, to CSX. It wanted to make GWSI happy. At the same time, it did not stop delivering cars because Chiquita would not meet its delivery deadlines if GWSI rejected cars. If that occurred, WestRock, Chiquita's shipper, could have shipped via CSX, which did not charge GWSI

---

[7] Ex. D-29 at NS_5316.

8

demurrage.

Despite GWSI's instruction to stop delivering cars if it insisted on charging demurrage, Norfolk Southern continued delivering cars to GWSI. Nevertheless, given Norfolk Southern's conduct aimed at inducing GWSI to accept cars, even though it could not unload them within the time set forth in the Tariff, GWSI reasonably believed demurrage would not be charged.

Norfolk Southern thrice substantially reduced demurrage charges. It reassigned charges to other customers in June 2014, waived demurrage charges for a three-year period in July 2015, and adjusted charges for credits not captured by the system in September 2015. When it did so, it offered no explanation. It was reasonable for GWSI to conclude from seeing the charges inexplicably disappear on invoices and Norfolk Southern's continuing to deliver railcars that Norfolk Southern was reducing the charges in response to GWSI's demand that Norfolk Southern stop sending railcars if it intended to charge demurrage.

Relying on Norfolk Southern's conduct, GWSI continued to receive railcars to its detriment. Unlike many service yards, Stoney Creek served more than one rail carrier. Of course, the shipper selects the rail carrier, not GWSI. But, GWSI could have convinced the shipper, WestRock, to send cargo by CSX, not Norfolk Southern. In that event, GWSI would not have been charged demurrage.

Norfolk Southern wanted it both ways. It wanted to keep the Chiquita paper business destined to GWSI, and, at the same time, collect demurrage. It was in Norfolk Southern's interest to keep shipping Chiquita paper to GWSI. As a result, Norfolk Southern induced, intentionally or with culpable negligence, GWSI to continue doing

9

business with Norfolk Southern while believing that it was not incurring demurrage. Therefore, Norfolk Southern is estopped from collecting the demurrage charges after February 2015.

**Conclusion**

Although Norfolk Southern did not intend to waive demurrage after February 2015, it induced GWSI to continue receiving railcars after GWSI had directed it to stop sending railcars if it insisted on charging demurrage. Because GWSI detrimentally relied on Norfolk Southern's conduct, Norfolk Southern is estopped from collecting demurrage after February 2015. Therefore, judgment will be entered in favor of GWSI.